EXHIBIT 1

Copies of Documents and Pleadings on File

with Horry County Court of Common Pleas

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| COUNTY OF HORRY | ) | |
| THOMAS FRAZIER, | ) | C.A. No.: 2023-CP-___-_____ |
| Plaintiff, | ) | |
| Vs. | ) | **SUMMONS** |
| GRAND STRAND MEDICAL CENTER/ HCA HEALTHCARE, INC./PARALLON, | ) | |
| Defendant. | ) | |

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action a copy of which is hereby served upon you, and to serve a copy of your Answer to the Complaint on the subscriber at his office at 4000 Faber Place Drive, Suite 300, North Charleston, SC 29405 within thirty (30) days after the service thereof, exclusive of the day of service.  If you fail to answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court for the relief demanded in the Complaint and judgment by default will be rendered against you.

HUNT LAW LLC

*s/Bonnie Travaglio Hunt*
Bonnie Travaglio Hunt
HUNT LAW LLC
4000 Faber Place Drive, Suite 300
North Charleston SC 29405
Post Office Box 1845, Goose Creek, SC 29445
(843)553-8709

Dated:  March 2, 2023

1

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
| | ) |
| COUNTY OF HORRY | ) |
| | ) |
| THOMAS FRAZIER, | )    C.A. No.: 2023-CP-___-_____ |
| | ) |
| Plaintiff, | ) |
| | ) |
| Vs. | )    **COMPLAINT** |
| | ) |
| GRAND STRAND MEDICAL CENTER/ | ) |
| HCA HEALTHCARE, INC./PARALLON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT AND JURY DEMAND

The Plaintiff, Thomas Frazier, by and through his attorney, Bonnie Travaglio Hunt of Hunt Law, L.L.C., North Charleston South Carolina hereby files his complaint against the Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon as follows:

## NATURE OF THE ACTION

1.    This action is brought pursuant to 42 U.S.C. 2000 of Title VII and 42 U.S.C. 1981 of the Civil Rights Act of 1964, as amended (42 U.S.C. §2000e, *et seq*.). The jurisdiction of this Court is invoked to secure protection of, and redress deprivation of rights guaranteed by federal law and state law which rights provide for injunctive and other relief for illegal discrimination in employment.

2.    This action is brought pursuant to the Age Discrimination in Employment Act. The jurisdiction of this Court is invoked to secure protection of, and redress deprivation of rights guaranteed by federal law and state law which rights provide for injunctive and other relief for illegal discrimination in employment.

2

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

3.  This action is brought pursuant to laws of the United States of America pursuant to 42 U.S.C. 1981 and discrimination statutes.

4.  This action is brought pursuant to laws of the State of South Carolina including but not limited to Wrongful Termination in Violation of Public Policy, Slander, and Negligent Supervision.

## PARTIES

5.  The Plaintiff is an individual who resides in the State of South Carolina at all times relevant to this action.

6.  At all relevant times the Defendants, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon were defined as employers pursuant to State and Federal Law.

7.  At all times, relevant to the allegations in this complaint, the Plaintiff was employed with the Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon.

8.  On information and belief, Defendant is an entity conducting business and affecting commerce in the state of South Carolina.

9.  At all times, relevant to the allegations in this Complaint, the Defendant employed several individuals in the State of South Carolina.

## JURISDICTION AND VENUE

10. That State of South Carolina has jurisdiction pursuant to the law.

11. The Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon is a private entity being sued pursuant to the State of South Carolina common law and statutes properly within the jurisdiction of this court.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

12. The Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon is a private entity being sued pursuant the law of the United States of American, Age Discrimination in Employment Act and Title VII.

13. The County of Horry is the proper venue for this action pursuant because this is the District and Division in which a substantial part of the events or omissions giving rise to the claims occurred.

### Procedural Prerequisites

14. The Plaintiff filed a charge of discrimination against the Defendant with the Equal Employment Opportunity Commission ("EEOC") alleging Race discrimination, Sex discrimination, Age discrimination, Disability Discrimination, hostile work environment, and retaliation.

15. The Plaintiff's first charge of discrimination was filed on December 17, 2021, Charge Number 436-2022-00459 and set forth the following:

I.    *That I am a former employee of Grand Strand Medical Center/HCA.*

II.   *That I believe that I was discriminated against based on my race (White), sex (male) and Age (over 40).*

III.  *That I was subjected to differential treatment and other employees. That I protested the Employers emails communications regarding the support of Black Lives Matter. As a result of my objections and protests I was subjected to differential treatment and retaliation based on my race in violation of title VII.*

IV.   *That I was discriminated against based on my Race, Sex and Age.*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

V.      *That younger less qualified individuals non in my protected categories have been treated more favorably.*

VI.     *That after we made the complaints regarding differential treatment based on race/sex/age and discrimination and was discipline and later terminated.*

VII.    *That the reasons for discharge were pretextual as the employer.*

VIII.   *That the employer has retaliated against me in violation of Title VII for my participation and making of complaints.*

IX.     *That my employer has violated Title VII and the ADEA.*

X.      *That individuals who are younger employees were treated more favorably, not bullied, not harassed, and not subjected to discrimination.*

XI.     *That I am being treated differently based on my age, race, and age former complaints of discrimination, harassment, and retaliation.*

XII.    *That I have been discriminated against based on my age in violation of the Age Discrimination in Employment Act.*

XIII.   *That I have been discriminated against based on my Race in violation of Title VII.*

XIV.    *That I was subjected to a hostile work environment based on my perceived Race in violation of Title VII and Age in violation of Age Discrimination in Employment Act.*

16.    The Plaintiff's first charge of discrimination contained an extensive memorandum/addendum regarding the treatment he had received, which included the following:

5

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*Race/Sex Discrimination*

*June 2021 –An employment survey closed on 31MAY2021. In that anonymous survey there are several opportunities for adding comments and I felt that I could speak freely regarding the way the company handled themselves during the racial turmoil that exploded last year after the George Floyd death. During the time of the civil unrest and rioting, HCA sent an email from the corporate office addressed to the entire enterprise describing how they would match donations from the company employees' donations and send that money towards social justice entities and the like. HCA, in turn, gave Black Lives Matter, Inc. and other groups large donations from the money raised from the employees and matched by the company. I raised questions about how the company is now disregarding white employees especially white men. These questions were raised because the hospital was told to create a 'Diversity, Inclusion and Equity (D/I/E) committee" and there was not one single heterosexual white male on the committee that wasn't in senior leadership. White male nurses, especially white male nurses in leadership are a clear minority in almost every hospital. During nurse leadership meetings at Grand Strand Medical Center, you can count 10 female nurse leaders to every male nurse leader. I expressed how it made me feel discriminated against because of the lack of true diversity and it being more like trying to force a perception that true diversity means not including white men. I continued by saying that I, like so many other employees, was unaware that such a group even existed. I also felt this way because despite trying to sell the perception of doing something impactful for Black Americans, HCA did the easy "public image" thing and donated money to BLM, Inc. before understanding what they really stand for as it states on their website. They promote racism and division which is the antithesis of HCA's core values and mission statement. This position created a lot of confusion to me and so many others. BLM did not and still does not support the black community with the donations they were given. One of the leaders of BLM took a bunch of the donated money and now owns a couple of houses in California, and at least one cost over $1 million. I received a call from the executive suite to have a chat with the COO, Marsha Myers to see "how I was and how I was feeling". This request was strange because the COO had never requested to see me personally. Marsha and I met the following day and she informed me that anonymous comments I made in an anonymous survey made them uncomfortable and they wanted to speak to me about them. I was forced to sit in front of senior leadership that day and take a stance in front of them and I was incredibly uncomfortable. I mentioned my discomfort a couple of times during the conversation, but I felt it necessary to defend my comments under duress. I was then told the CEO wanted to speak to me and an appointment was set for the following day. I sat with Mark Sims, CEO Grand Strand Medical Center, the following morning and spoke with him about my anonymous comments from the survey. Again, I expressed my discomfort in having this conversation, but was told it was just a conversation. During our conversation I reiterated my feelings regarding the company's stance during the 2020 civil unrest and riots and the company's knee jerk reaction to donate large amounts of money*

6

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*to any group that thinks this nation is deeply rooted in racism and white supremacy. I spoke again about the D/I/E committee, and we discussed the lack of diversity in that committee. I also spoke to him about the committee sending out an email that was addressed to the hospital from the D/I/E committee. The email read of the man in Georgia that went and murdered a few Asian sex workers and the committee then called for awareness of Asian hate. I spoke up because the man that murdered those ladies also murdered a couple of white women, too. The statement from the committee came before any investigation was done and the facts came out. The fact is the murderer was truly mentally ill and did not solely focus on Asian women but found the most convenient sex workers and killed them until he was caught. I followed up with questioning why the committee did not send out an "awareness" email when around the same timeframe, a former NFL player went a killed an entire family in South Carolina. The father in that family was a doctor, he was white. The murderer was a black man. I did not notice it until November 2021 that telling the company I held an unpopular opinion in an anonymous survey would create a chain of events that ultimately lead to my termination.*

*Also in June 2021, new freestanding emergency department is being built and the hiring process for the new department is being held. I was asked to apply for every open emergency services manager position because of my history of high performance and quality results and it would 'look bad' if I didn't attempt to go after these lateral roles. I went through the interview process and was told after by Amy Gurano that I would "pretty much have a choice of positions". The choices were to stay at my current location, laterally move to the main campus and work directly under Amy, or laterally move to take on the role of managing the new facility. Within a week, I received a write up for a phone call that Amy and I had over staffing where Amy told me in the evening hours one day in June that I would have to cover a call-out at my facility. I told her that I did not have the resources to cover and she would need to send help from the main campus to cover the shift. The call escalated when Amy told me that they would not send help and I would personally need to cover the shift. There were never any derogatory comments made, nor did either of us say any cuss words we both just raised our voices. Amy's solution was not feasible because I had already worked a full day and working in an emergency department for 24 hours straight is dangerous. I raised my voice, and she raised her voice. We then decided to calm down and talk later. I apologized for raising my voice. I ended up going in to cover the shift, but I went in at 3a instead of 7p so I could get some rest before going in. The main campus was able to send help after all. I feel discriminated against because Amy and I had never had a conversation escalate like that, yet I was given a formal disciplinary written action for it the first time it happened. There was another emergency department manager, Sandy Harris, who had several public yelling and cussing matches with Amy. I requested a meeting with Marsha Myers where we talked about how those episodes were affecting the main campus ER staff morale. Sandy was finally written up after several accounts of these incidents that took place in the administration office in the ED and in the parking lot at the hospital. My write up for the first time I did something similar took me out of the running for any of the open leadership roles except for my current role and I stayed where I was currently working at the*

*time I was terminated. Maggie Fisher, younger and female, was then hired for the role of opening a brand-new facility with no experience in leadership and limited staff and resources. At that time, I had been with the company for almost 6.5 years and in a leadership role for more than half of that time. I had only had one corrective action in my career at Grand Strand and it was more than 5 years ago. That particular corrective action was a verbal warning, and it was for attendance in a rolling 12 month cycle. Since June 2021, I have been written up three times. The first was for the phone call with my boss, Amy Gurano. The second was for a post I made on LinkedIn regarding vaccine mandates. The final termination action was for being unprofessional and making disparaging remarks against the LGBTQ + community of which the former is subjective, and I disagree, and the latter is purely false and defamatory.*

**Age/Sex/Gender/Disability Discrimination**
*09NOV2021 Vaccination mandates stemming directly from the federal government are being forced on our healthcare workers are now forcing our company to mandate every employee get vaccinated or we get terminated unless we were to be granted an exemption based on medical or religious reasons.*
*We were given those two choices in an email sent by the CEO of the company, Sam Hazen. After leaving work for the day, I posted on LinkedIn about my opposition to the vaccine mandates and government overreach. Within the first 10 minutes the first person "views" the post. Almost immediately I then start to see senior leadership from my hospital are stalking my LinkedIn profile on a consistent basis. Shelly Pitchall (Assistant Chief Nurse Officer), Carly Pasquini Senior Vice-President of Human Resources), Marsha Myers (COO), and an unidentified senior leader at the hospital. When I decided to post this opposition to the vaccine mandates I made sure to disassociate myself from my hospital and HCA on LinkedIn. Carly Pasquini later would tell me that they have a screenshot of the post showing me being associated with Grand Strand Medical Center and identified myself as a leader. I have asked to see this photo and have never been afforded the opportunity. I maintain that I took steps to disassociate myself with the company before posting my personal opinion regarding the government's overreach with vaccine mandates. 11NOV2021 after 36 hours of seeing senior leadership from the hospital checking my LinkedIn profile on a fairly consistent cadence. I send a message to Carly Pasquini over Webex messenger and ask if there is something I need to be concerned about. I followed up with stating I was concerned because the leadership noted above has been looking at my LinkedIn profile on a regular basis over the last 36 hours and I wanted to know why. I never got a response from Carly, instead I got a text from Marsha Myers trying to arrange a phone call. I obliged and left it to her to call me. I received a call as I was walking to my care to leave for the day. I was notified that Carly was on the call, too. I told them I was in my car and it might be hard for me to hear. My concerns about the constant surveillance on my LinkedIn profile were creating an uncomfortable and hostile work environment so I wanted to see what they had to say. We began talking about the post on LinkedIn and they were both telling me that I was violating policy and that the post reflects poorly on me and then I began having a harder time hearing.*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*I know that Marsha has seen my hearing aids and knows I am hearing impaired. Marsha and Carly were speaking through a speakerphone and when more than one person would talk the sound would distort. I told them I was not able to understand what they were saying. The phone call lasted almost my entire 35 minute drive home. I got off the phone wondering what they heard from me and what they thought I heard from them. I never got a follow up conversation, instead I received a formal final written warning on 30NOV2021 that was penned by Carly Pasquini and delivered by Amy Gurano. In my conversations with Amy Gurano regarding this post, we discussed how this was unfair, especially for them to take such harsh actions against me regarding this post. I feel Carly Pasquini, head of our HR department and in her mid-30s, discriminated against me because of my age and gender. I was not given a true opportunity to be a part of any meaningful conversation with any of my direct or senior leadership. I asked, in writing, for an appeal and was never given one. I do not believe that they took any actions regarding my request for appeal because I was terminated the next week. Another point I would like to make is that I look at the social media that my former peers at Grand Strand share with the company and everyone their "friend network" reaches. My friend, Deanna Schreffler, is a former colleague and fellow manager. Deanna is female and younger than me. She works at Grand Strand Medical Center and is the Emergency services manager for the night shift at the main campus. She is an amazing leader and works hard for her team and they hold deep respect for her. Her personal Facebook account is the same one she uses as a manager/administration person at Grand Strand for every emergency department sponsored Facebook page. Since becoming a manager, a leader, Deanna has posted some very controversial things regarding abortion and politics that I personally do not agree with, but I can imagine more people would find her posts and shares offensive than my one single post about vaccine mandates. Amy Gurano "loved" a post of Deanna's regarding abortion and "liked" pictures of other controversial topics. Recently she posted progressive pictures of her doing a 12 bar pub crawl. There are so many of her posts are "liked" and "loved" by her direct reports and her leadership. That is a clear double standard when you compare what happened to me and that my closest colleague at Grand Strand continues to post perceivably offensive and subjectively unprofessional public posts. I find that to be extremely contradictory to the way I was treated by my single post on LinkedIn. It is paramount to mention that between the time I posted that single post on LinkedIn two federal judges agreed with my personal opinion and overruled the vaccine mandates. On 17NOV2021 we received an update from Sam Hazen that we still had to comply with the mandates because HCA is subject to CMS regulations and reimbursement. The update included a message about it being easier to get exempt which undermines the whole idea of a mandate. And finally, on 01DEC2021 we received final communication that we were no longer subject to any type of vaccine mandate. Even with all this news Carly still pushed for my discipline action to be filed before the end of the month and before I had a chance to respond. My response was hopefully filed in my personnel file. And still, the senior leaders did not hold an intelligible conversation with me regarding the whole thing before any further actions. My disciplinary action I received on 30NOV2021 also made me*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*ineligible for a director leadership role I was in contention for. I had been courted by the HCA Houston Southeast hospital to take on their Director of Freestanding Emergency Departments. They paid all accommodations for me to travel to Houston, TX to interview for the role. I truly feel like I would have been offered the position had this disciplinary action not taken place. I was an accomplished leader in my service line throughout the entire enterprise. My work speaks for itself. I was a great employee. I served my team and we flourished. I cannot understand how all this happened over the past month. Finally, on 11DEC2021 I was informed that the hospital had issued a BOLO (Be On The Lookout) with my photo and description on it. The BOLO states "Subject has had employment terminated. Unspecified threats have been made toward facility leadership." There is absolutely no way I threatened anyone. This type of personal and professional attack is an attempt to cancel me in this town and company. These actions are both despicable and egregious. I have never seen this type of  smear campaign on anyone that was terminated from Grand Strand since I worked there.*

17.    The Plaintiff filed a second charge of discrimination on January 13, 2022, alleging Retaliation.  The Charge set forth the following:

I.    *That I am a former employee of Grand Strand Medical Center/HCA.*

II.    *This is my second charge of discrimination.*

III.    *That after my termination I properly filed an appeal of my termination by peer review panel in accordance with HCA Policy HR.ER.011.*

IV.    *That the Employer failed and refused to follow its policies and procedures in retaliation for my complaints regarding discrimination and the charge of discrimination filed in December.*

V.    *That the retaliation is in violation of the EEOC laws regarding Title VII, ADA, and ADEA.*

18.    The EEOC received the second charge, refused to open a file, and referred the second charge to the SCHAC.  The SCHAC refused to open an investigation and referred the charge back to the EEOC.  The EEOC failed to investigate.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

19.    The Defendants submitted a position statement in response to the Plaintiff's Charge of Discrimination, titled it confidential and refused to allow any publication of the facts contained in the Position statement.

20.    The Plaintiff received a right to sue from the SCHAC on December 12, 2022.

21.    The Plaintiff's right to sue from the EEOC for the Charge of Discrimination was dated January 11, 2023.

22.    That the Right to Sue set forth the EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

23.    That fewer than ninety days have elapsed since the Plaintiff received the Right to Sue on the Plaintiff's charge of discrimination.

## POLICIES OF HCA HEALTHCARE

24.    Diversity and Inclusion representations:

*HCA Healthcare is committed to providing equitable access to high-quality care for our patients, fostering a diverse and inclusive workplace for our colleagues, and cultivating and sustaining relationships with suppliers and community partners that broaden our reach and deepen our understanding in the communities we serve. Below, please find more information about our commitments and actions to advance diversity, equity and inclusion across our organization.*

*Ensuring accountability Executive Diversity Council – Sponsored by Chief Executive Officer, Sam Hazen, and comprised of executive leaders, this cross-functional council leads diversity, equity and inclusion (DEI) initiatives across HCA Healthcare and advises on strategic decisions as we make progress towards our goals and objectives. Division DEI Directors – In addition to our 20-person corporate-based DEI department, led by Chief Diversity Officer, Sherri Neal, we*

11

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*have established division DEI leaders to execute on HCA Healthcare's commitment to DEI at the local level. These new roles provide local leadership and direction in developing, implementing, and managing strategic DEI initiatives. Division DEI Councils – The organizational design of HCA Healthcare places our sites of care under the leadership of division teams who oversee geographical markets within the organization. Established in all divisions, our division DEI councils are comprised of division leaders and facility representatives to support the deployment of key DEI strategies and programs across the enterprise.*

*Our commitment to colleagues HCA Healthcare is focused on fostering a culture of inclusion and belonging for our colleagues through workplace programs, education, diverse talent acquisition, engagement and development. Key initiatives include: Black Senior Leadership Council – A group of Black senior leaders who meet with CEO Sam Hazen to address topics related to supporting our Black colleagues and communities. Based on the recommendation of this council, HCA Healthcare launched a sponsorship program in 2022 for a cohort of Black colleagues to accelerate advancement in leadership. This is a phased approach that will expand over time to include a broader focus on leaders of color and female leaders. Colleague Networks – Afinity groups that provide colleagues opportunities to convene around shared experiences, including groups for Black colleagues, women, young professionals, LGBTQ+, Hispanic/Latinx, and Asian colleagues, veterans, colleagues with disabilities, and a group focused on mental health and wellness – each with a senior leader serving as executive sponsor. Conscious Inclusion Training – Equips leaders to recognize and mitigate diferent types of unconscious biases and prepares them with practical day-to-day skills and resources to engage and support our colleagues. As of August 2022, 77% of colleagues at the director level and above completed formal conscious inclusion training. In 2021, all HCA Healthcare colleagues received education on mitigating bias, a crucial component of conscious inclusion, as part of our annual code of conduct refresher training. HBCU/HSI Partnerships – We are investing $10 million into Historically Black Colleges and Universities (HBCUs) and Hispanic-Serving Institutions (HSIs) to support our goal to develop a diverse pipeline of healthcare professionals and leaders. Recent investments include partnerships with Florida A&M University (FAMU), Florida International University (FIU) the University of Texas at El Paso (UTEP), Tennessee State University and Fisk University. Diverse Talent Acquisition – We are committed to strengthening the diversity of our talent pool and supporting the advancement of people of color and women in leadership. As of July 2022, people of color represent 39% of new hires into management and supervision roles at HCA Healthcare. Additionally, we continue to diversify our class of emerging leaders for the Executive Residency Program, with 40% of our 2022 cohort comprised of people of color and 40% comprised of women.*
*BRAVE Conversations – Our award-winning BRAVE (Bold, Relevant, Authentic, Valuable and Educational) Conversations program provides colleagues with opportunities to discuss complex topics through a safe, immersive dialogue experience. Thousands of colleagues have attended BRAVE Conversations over the past five years on topics such as mental health, celebrating LGBTQ+ pride and*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*advocating for change, building bridges with the deaf and hard-of-hearing community, and honoring our veterans. Military Afairs – In 2022, HCA Healthcare was recognized with the Best for Vets award for the third consecutive year from Military Times and as a militaryfriendly employer by VIQTORY for the 12th consecutive year. In addition, in 2021, HCA Healthcare and afliated hospital Grand Strand Medical Center were awarded the prestigious Secretary of Defense Employer Support Freedom Award, the highest recognition given by the U.S. Government to employers for their support of their employees who serve in the National Guard and Reserve. Since 2012, we have hired more than 40,000 veterans, active-duty personnel and military spouses.*

25.     HCA Healthcare Social Media Guidelines:

*HCA Healthcare Social Media Guidelines*

*These HCA Healthcare Social Media Guidelines apply to Company-authorized users of social media, as well as Company colleagues' personal use of social media. For purposes of these guidelines, "Company" refers to HCA Healthcare, Inc. and its affiliated entities, including direct and indirect subsidiaries and partnerships, joint ventures and other entities in which subsidiaries have an ownership interest. "Colleagues" refers to persons employed by any Company entity. Individuals seeking to engage in social media activity must adhere to these guidelines as well as the Company's Appropriate Use of Communications Resources and Systems Policy, EC.026.*

*General Provisions*

*Blogging and other forms of social networking include but are not limited to video or wiki postings, Reddit, sites such as Facebook, Instagram, Twitter, and YouTube, chat rooms, personal blogs or other similar forms of online journals, diaries and/or personal newsletters.*
*Unless specifically authorized, colleagues are restricted from speaking on behalf of the Company. Colleagues are expected to protect the privacy of patients, colleagues and other stakeholders and are prohibited from disclosing patient information without proper authorization. Colleagues are also prohibited from disclosing proprietary or confidential information to which they have access and work with as part of their job duties, without proper authorization.*

*Monitoring*

*Colleagues should have no expectation of privacy while posting information to social networking sites. Postings often can be reviewed by anyone, including the Company. As described in EC.026, the Company reserves the right to use content management and social media listening tools to monitor comments or discussions about the Company, its colleagues, its patients and the industry posted on the Internet. Further, colleagues should understand the Company may respond to such*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

comments or discussions, and that response may occur online, or, in certain circumstances, may occur offline and may include discipline where appropriate.

*Reporting and Discipline for Violations*

1.    Reporting Violations. HCA Healthcare and its affiliates strongly urge colleagues to report any violations or possible or perceived violations to a supervisor, manager, the HR department, the Facility Privacy Official and/or Ethics & Compliance Officer (if patient information is involved) or the Ethics Line at https://hcahealthcareethicsline.ethix360.com or by calling 1-800-455-1996.

2.    Discipline. HCA Healthcare and/or its affiliates investigate and respond to reports of EC.026 violations, these Social Media Guidelines and other related policies. Violations may result in disciplinary action. Managers may not restrict a colleague's access or take any disciplinary action based on a colleague's use of social media without first consulting with their Human Resources VP and HCA Healthcare Employee Relations.

*Company-Authorized Use of Social Media*

The goal of authorized social media is to enhance the exchange of information between the Company and its constituents in order to drive business results and support our long-term success. Authorized use of social networking media is purposeful in conveying information about Company services, promoting and raising awareness of the Company, communicating with colleagues, patients, candidates, business associates, the media, as well as discussing activities and events.
When colleagues are engaged in authorized social networking, blogging or using other forums, the Company must ensure use of these communications is consistent with and supports the Company's mission and values, and maintains the Company's brand identity, integrity and reputation while minimizing risks inside or outside the workplace.
The following rules and guidelines apply to social networking when expressly authorized by the Company.

*Authorized social media channels.* Colleagues, business units and departments are prohibited from creating internal and external (public-facing), HCA Healthcare or affiliate-named social media accounts, without prior authorization. The marketing department or equivalent and senior management are permitted to remove or request the removal of social media pages that are not authorized.
*Content.* Only authorized colleagues can prepare and modify content for Company-sponsored blogs and/or Company-authorized social networking entries. Content must be relevant, add value and meet at least one of the specified goals or purposes developed by the Company. If uncertain about any information, material or conversation, discuss the content with your manager and/or your organization's marketing director or equivalent.

14

*Unauthorized Content. Business units and departments are responsible for ensuring all blogging and social networking information complies with Company policies. The Marketing Department or equivalent and senior management are authorized to remove any content that does not meet the rules and guidelines of Company policy or that may be illegal or offensive. Removal of such content may be done without permission of the poster or without advance warning. Contact your Marketing Department or equivalent or follow the chain of command to report unauthorized or questionable content.*

*Copyright. Copyrighted content cannot be posted on any HCA Healthcare-affiliated blog or social media channel without first obtaining written permission from the copyright owner.*

*Guest Bloggers/Posters. The Company expects all guest bloggers and posters to abide by these guidelines. The Company reserves the right to remove, without advance notice or permission, all guest bloggers' and posters' content considered inaccurate or offensive. The Company also reserves the right to take legal action against guests who engage in prohibited or unlawful conduct.*

*Media. If contacted by the media or press about a post that relates to Company business, colleagues are required to speak with their manager and the Company's Marketing and Corporate Affairs Department before responding in any capacity that could be viewed as a spokesperson for the Company.*

*Personal Use of Social Media When on Working Time or Using a Company-Provided Device*

*Colleagues may occasionally access and engage with social media even when on working time and/or by means of a Company-provided device. While such access does not require express authorization, it should be infrequent and brief; must not interfere with or detract from a colleague's responsible performance of his or her job duties. Any posts or communications by a colleague during working time or using a Company provided device must not be inconsistent with the business interests of the Company; must not disclose protected patient information or confidential Company information; must not be malicious, defamatory, obscene, threatening; and must not be the sort of communication that would reflect negatively on the Company if the audience were to conclude that it was an official Company communication. The Company reserves the right to restrict access to certain social applications on company-owned devise due to privacy, security and legal concerns.*

*A colleague who chooses to engage in personal use of social media when on working time or using a Company-provided device must understand that, because the Company is facilitating their use of social media, the Company may monitor any and all such use and may discipline the employee for social media use that*

15

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*violates these guidelines. By way of example only, a colleague would likely be disciplined (and possibly terminated) for using social media to make threats against others, to express racist opinions, to use obscene language, or to make derogatory or disrespectful comments about persons or organizations while on working time or using a Company-provided device.*

*Personal Use of Social Media When On Personal Time and Using Personal Devices*

*The Company respects the right of colleagues to participate in blogs and use social networking sites when using their own devices during non-working hours and does not discourage self-publishing or self-expression. Colleagues are expected to follow these policies and guidelines to provide a clear distinction between you as an individual and you as an HCA Healthcare colleague.*

*Personal Responsibility. You are personally responsible for your commentary on social media. You can be held personally liable for commentary that is considered defamatory, obscene, proprietary or libelous by any offended party, not just the Company.*

*Be Respectful. If you have identified yourself as a colleague of the Company, you should not use blogs or social networking sites to post items that could be viewed as malicious, obscene, threatening, harassing, or bullying. Prohibited threatening, harassing, and bullying conduct includes offensive posts meant to intentionally harm someone's reputation or posts that discriminate or could contribute to a hostile work environment on the basis of age, race, color, gender, disability, religion, protected veteran status, national origin, sexual orientation, gender identity, or genetic information.*

*Disclaimer. When you identify yourself as a colleague of the Company, some readers may view you as a spokesperson for the Company. Because of this possibility, you should state in the description or "about" section of any public profile that the views expressed by you through social media are your own and not those of the Company. Because colleagues may not represent that their views are those of the Company, colleagues are not permitted to post the trademark or logo of the Company on personal blogs or other sites.*

*Privileged or Confidential Information. Colleagues are not permitted to post Company-privileged information, including copyrighted information or patient protected health information. Colleagues who have access to and work with confidential information as part of their job duties, cannot disclose or post such information without proper authorization.*

*Workplace photographs. Colleagues must follow the Company's policy regarding photos taken in the workplace. No photos showing patients or family members, or showing protected health information, may be posted at any time. You should ask permission before posting photos of co-workers. Be mindful of public perception and use good taste when posting workplace photos.*

*Advertising. Except as authorized or requested by HCA Healthcare or an affiliate, colleagues may not post on personal blogs and social networking sites any advertisements or photographs of Company products, nor sell Company products and services.*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*Endorsements. HCA Healthcare and its affiliates do not endorse people, products, services or organizations. Official accounts should not be used to provide such endorsements. For personal social media accounts where your connection to HCA Healthcare is apparent, you should be careful to avoid implying that an endorsement of a person or product is on behalf of HCA Healthcare rather than a personal endorsement. As an example, LinkedIn users may endorse individuals or companies, but may not use HCA Healthcare's name or its affiliates' names in connection with the endorsement, nor state or imply the endorsement is on behalf of HCA Healthcare or its affiliates, or state specifically that the endorsement is based on work done at HCA Healthcare or its affiliates.*

*Solicitation. Unless authorized, colleagues are not permitted to solicit gifts or donations that directly benefit patients, colleagues or themselves. For example, a colleague is not permitted to develop a fundraising page, such as GoFundMe, Fundly, Bonfire, DonateKindly, Kickstarter or Crowdwise that associates or appears to associate the Company with the solicitation and/or receipt of gifts or donations for patients, Company colleagues or the individual colleague who created the fundraising page. Nothing in this section prohibits colleagues from donating to these types of fundraising sites or creating non-Company associated fundraising sites for friends, family or themselves. For further information, please see the Company's Solicitation policy, HR.ER.026.*
*Branding. Your social media name, handle or URL should not include HCA Healthcare or your affiliated employer's name or logo.*
*Managers and Supervisors. HCA Healthcare discourages staff in management/supervisory roles from initiating and/or accepting "friend" requests or follows from or with colleagues who report to them.*
*Patient communication. Do not use your personal social media account to discuss or communicate patient information with one of your patients, even if the patient initiated the contact or communication. Always use Company-approved communication methods when communicating with patients about their health or treatment.*
*Privacy and Security. Consult the Information Protection & Security site on Atlas Connect for social media privacy and security tips. To protect sensitive patient and colleague data, the use of TikTok is not permitted on company-owned devices.*

*If you have any questions relating to these guidelines, a personal blog or social networking, ask your supervisor, another member of management, your HR Business Partner, Marketing/Communications Director, Ethics and Compliance Officer or Facility Information Security Officer. You can also submit inquiries to social@hcahealthcare.com.*

26.    Peer Review Process

*Applies to all employees except employee groups listed as 'At Will' in the Limitations on Employment policy and employees under an employment agreement PURPOSE:*

17

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*To provide a step resolution process for employment-related disputes and to provide employees an opportunity to resolve certain employment-related claims in a fair and reasonable manner.*

*1.      Step Process: The step process is intended to assist the business entity and its employees in creating and maintaining open, forthright and honest communication. The Employment Dispute Resolution Process does not replace, but is in addition to all other reporting and compliance measures available to employees, such as the Ethics Line. There are four (4) steps in the employment dispute resolution process:*

*a.      Step 1: Discuss the problem with your manager*

*b.      Step 2: Appeal manager's decision to the Department Head or Center Administrator*

*c.      Step 3: Appeal Department Head or Center Administrator's decision to the Peer Review Panel*

*d.      Step 4: Appeal peer review panel's or Department Head or Center Administrator's decision to the business entity CEO, Regional VP of Operations, or corporate vice president, as appropriate*

*2.      Peer Review Panelists: The Peer Review Panel process is an opportunity to participate in a process intended to ensure that disputes concerning the termination of employment are resolved in a prompt, fair, and equitable manner. The issues presented may have serious and long lasting consequences. Employees selected as a panelist are expected to:*

*a.      Render an objective and unbiased decision that is based only on the facts presented and the application of policies, procedures, and past practice*

*b.      Maintain strict confidentiality and not disclose any of the information learned during the process, and participate fully in the Peer Review Panel process*

## FACTUAL BACKGROUND

27.    That the Plaintiff is a former employee of the Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon, that was wrongfully terminated from his employment.

28.    That the Plaintiff is a Caucasian male over the age of forty.  The Plaintiff is a proud veteran of the United States Army.  The Plaintiff suffers from a disability.  The Plaintiff has a hearing impairment and wears hearing aids to assist him.

29.    The Plaintiff was hired by Grand Strand Regional Medical Center a subsidiary of HCA Healthcare, Inc./Parallon on February 23, 2015.

18

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

30.     That the Plaintiff was hired by the Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon, as Emergency Department Nurse Manager at Grand Strand Regional Medical Center.

31.     That the Plaintiff was promoted to the position of Manager of Emergency Services during his employment.

32.     That the Plaintiff was directly supervised by Amy Gurano, Director of Emergency Services.

33.     As the Manager of Emergency Services, the Plaintiff's duties and responsibilities included but were not limited to 1. Hiring/promotions/demotions, 2. Orienting new staff, 3. Managing the scheduling for staff, 4. Run staff meetings, 5. Handle patient complaints, 6. Investigate and Handle patient grievances, 7. Investigate and handle staff complaints, 8. Attend meetings at main campus, 9. Report out metrics details and other items, 10. Employee engagement, 11. Patient experience, 12. Vendor management , 13. Maintain my facility (freestanding ER) utilizing work order process, 14. Grow team through coaching, 15. Meaningful rounds with individual staff members, 16. Coaching behaviors to align with hospital standards, 17. Education for staff and self, 18. Mandatory certifications, 19. Employee evaluations, 20. Disciplinary actions, 21. Policy development, 22. Cover in staffing as needed, 23. Budgeting/inventory, 24. Chart audits, 25. Regulatory survey readiness, 26. Maintain employee records, and 27. Team building and employee morale.

34.     That the Plaintiff was considered an exemplary employee with no issues of performance or discipline.   The Plaintiff received one discipline regarding attendance during his employment at the beginning.   However, the last 5 years of his employment included no

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

counseling, discipline issues up and until he complained about differential treatment, discrimination, vaccine mandates and other issues.

35.   In June 2021, the Plaintiff applied for several positions for the new freestanding emergency department that was being built by the Defendants.  The Plaintiff was actually asked to apply for several positions based on his experience and performance with the Defendants. The Plaintiff was also beginning the process to apply for positions in Texas for a freestanding emergency department with the Defendants.

36.   On May 31, 2021, the Defendants presented an anonymous survey to the Employees to gage how the Defendants were performing as employers.  The Survey allowed for commentary from employees.  The Plaintiff exercised his freedom to write and speak freely in the survey regarding the Defendants handling of themselves regarding the racial turmoil that exploded after the incident regarding George Floyd and the differential treatment of the public, and its employees based on race.

37.   The Plaintiff specifically set forth his concerns, believing the survey was truly anonymous. The Plaintiff specifically mentioned the HCA emails that were sent from Corporate to the entire hospital enterprise describing how they would match donations from the company employee's and send money towards social justice entities.  HCA gave large donations to Black Lives Matter, Inc. and other groups.  The Plaintiff specifically addressed the failure of HCA to pay attention to all individuals employed by the Defendant because on its surface its Diversity, Inclusion and Equity Committee (D/I/E) was failing to include all employees including white men.  The Plaintiff specifically addressed that not one single heterosexual white male on the committee that wasn't in senior leadership.  The Plaintiff contended that white male nurses are a minority in leadership at the hospital.  The Plaintiff

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

addressed the fact that in all leadership meetings at Grand Strand Medical Center you could count 10 female nurse leaders to every male nurse leader. The Plaintiff further addressed how the true lack of diversity made him feel discriminated against. The Plaintiff continued in the anonymous survey by pointing out that HCA failed to research BLM, Inc. and donated money without knowing where that money was actually going which violated HCA's core values and mission statement when it came to true Diversity, Inclusion and Equity. The BLM, Inc. movement promoted racism and division. The Plaintiff informed the Defendant through the anonymous survey that the contrary actions confused him. The Plaintiff further pointed out that the leaders of BLM, Inc. had not spent the donations on making the lives of individuals better but had bought themselves houses.

38.     In June 2021, after submitting the survey, the Plaintiff received a call from the Executive Suite that his presence was requested to have a chat with the COO, Marsha Myers to see how he was and how he was feeling. The Plaintiff had never been called to discuss anything with the COO previously.

39.     The Plaintiff was forced to sit in front of senior leadership and defend his anonymous responses. The Plaintiff informed senior leadership that he did not feel comfortable. The Plaintiff felt it was necessary to defend his position but also felt that he was under extreme duress. After meeting with the COO, the Plaintiff was informed that he would be required to meet with the CEO, Mark Sims. The Plaintiff again expressed his extreme discomfort at having to defend his anonymous comments, the only response from the CEO was that it was just a conversation. The Plaintiff further defended all his statements and concerns regarding discrimination, the company's knee jerk reaction to donate large sums of money that thinks this entire nation is deeply rooted in racism and white supremacy and the

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

overwhelming feeling that because of his status as an older Caucasian Male he was not valued. The Plaintiff again addressed the discriminatory perception of the D/I/E committee and the lack of diversity on the committee. During the conversation, the Plaintiff also discussed that the D/I/E committee sent out an email regarding the man who killed a few Asian sex workers and called for awareness of Asian Hate but failed to address the issue of the Doctor that was murdered with his family by an African American.

40.    After the meeting with executives, the Plaintiff went to Ethics and Compliance regarding the conversation with the COO and CEO, his feeling regarding the interrogation and the fact that he felt like he was being discriminated against.

41.    After this conversation the Plaintiff began to suffer a hostile work environment and retaliation for his complaints regarding differential treatment. The Plaintiff continued his protests regarding the emails from employees regarding Black Lives Matter, Inc. as the Plaintiff was a firm believer that all lives matter especially as a hospital providing medical care to the public.

42.    In July 2021, the Plaintiff had a discussion with his supervisor, Amy Gurano instructed the Plaintiff after working a 7p to 7a shift he was to return to the hospital immediately and work 8a to 4p that same day. The Plaintiff reacted to the instruction with "are you kidding me?" Ms. Gurano proceeded to be condescending and belligerent with the Plaintiff. The Plaintiff refused as for the safety of his patients. Ms. Gurano insisted. The Plaintiff informed her that it was not safe for him to work such a shift without sleep. Ms. Gurano raised the temperature of the conversation. The Plaintiff was disciplined. The Plaintiff witnessed others in his department, in the same position as him who were loud and combative on the ER floor with supervisors and Gurano and were not disciplined.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

43.    The Plaintiff was disciplined in retaliation for his comments on the survey, his complaints regarding differential treatment.

44.    That write up was for pretextual reasons, ultimately the Plaintiff was again treated differently based on his sex.

45.    That due to the write-up the Plaintiff was not eligible for any of the management positions that he was applying for at the new freestanding emergency department.

46.    In October 2021, the Plaintiff had a conversation with Gurano regarding the loss of a manager at South Strand Campus, and how he was willing to help.  The Plaintiff developed a plan for a him to fill a six week interim role where he would fill in at both South Strand and North Strand Campus as a manager.  Gurano praised the Plaintiff regarding his growth.  The plan was put in place that the Plaintiff would start the dual role on November 7, 2021.

47.    On November 4, 2021, the Plaintiff discussed with Gurano that he was applying for a new job within the organization but outside his current division in Director Emergency Services FSED at HCA Houston Southeast.  The Plaintiff informed her that he would have a call with the COO of the Southeast the next day.

48.    On November 5, 2021, the Plaintiff sent an email to Marsha Myers and Gurano that he had applied for the job in Houston, Tx and spoke to the COO and had been informed that the new job would be in touch.

49.    On November 8, 2021, the Plaintiff had a call with Southeast regarding a face-to-face interview.  It was planned that the Plaintiff would travel to Houston November 22 to the 24th to do site visits and interviews.

50.    On November 9, 2021, the Plaintiff was informed that the federal government was forcing healthcare workers with the company to take the vaccine.  The Plaintiff was informed that

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

every employee would get vaccinated or be terminated. The Defendants' CEO, Sam Hazen sent an email to all employees informing them of their choices.

51.    The Plaintiff disassociated himself from Grand Strand/HCA/Parallon completely on his LinkedIn social media. The attempt was not successful. However, with in several minutes the Plaintiff had accomplished disassociation. After leaving work on November 9, 2021, the Plaintiff posted his opposition to the vaccine mandates and the government overreach. Within 10 minutes of posting the Plaintiff's post had been viewed by several from Grand Strand/HCA/Parallon including Shelly Pitchall (Assistant Chief Nurse Officer), Carly Pasquini Senior Vice-President of Human Resources), Marsha Myers (COO), and an unidentified senior leader at the hospital.

52.    On November 10, 2021, the Plaintiff observed a cadence of views on his profile from senior leaders. The Plaintiff was informed by Gurano that Marsha Myers was in her office and she was concerned about the post. The Plaintiff and Gurano discussed the topic and Gurano informed the Plaintiff that she agreed with his perspective.

53.    On November 11, 2021, the Plaintiff observed the senior leaders still stalking his LinkedIn profile. As a result of the executive searching his LinkedIn profile the Plaintiff sent a message to Carly Pasquini, Vice President of HR and asked her if he should be concerned. The Plaintiff further followed up stating that he was concerned about leadership looking at his profile over the last 36 hours. Carly Pasquini never responded to the Plaintiff's concerns.

54.    On November 11, 2021, the Plaintiff is on the way home from work and is informed that Myers and Pasquini have concerns regarding the post. The Plaintiff informed them that he is in the car and due to his hearing impairment cannot hear them. The Plaintiff did hear

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

that "as a leader he shouldn't post things like that on social media." The Plaintiff informed the Myers and Pasquini that the post was not about HCA/Grand Strand but about the overreach of government.

55.      Later the Plaintiff was informed that the hospital had screenshot of his association with the hospital, leadership and his post. The Plaintiff requested to view the screenshot, the hospital has failed and refused to produce it.

56.      The Plaintiff complained to HR that he felt the constant surveillance on his LinkedIn profile where creating a hostile work environment for him. HR informed him that they felt his post was a violation of policy.

57.      That the Plaintiff was aware that the other Manager of Emergency Services a younger female was not subjected to the same scrutiny and discipline as the Plaintiff for her posts on social media. The younger female Deanna Schreffler was permitted to post on different social media sites with no repercussions.

58.      Other female counterparts were permitted to have raucous altercations with managers and executives with no repercussions. None of the younger females were disciplined for their actions such as the Plaintiff.

59.      The Plaintiff went to Houston and had excellent interviews.

60.      The Plaintiff did not see Gurano until November 29, 2021.

61.      That the Plaintiff was subjected to differential treatment during his employment. Other employees within the department were not subjected to the same criticism, overbearing nature, and harassment that the plaintiff was subjected to.

62.      The Defendant, Grand Strand negligently supervised its management.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

63.   On November 29, 2021, Gurano presented the Plaintiff with a final written warning for

      violating Social Media policy.  Gurano informed the Plaintiff that she did not write the

      warning and that it was written by Pasquini.  The Plaintiff requested a day to respond to

      the write up.

64.   On November 30, 2021, Gurano informed the Plaintiff that she had placed the write up in

      his personnel file and stated he refused to sign.

65.   On November 30, 2021, the Plaintiff arrived at Gurano's office and presented her with his

      letter protesting the final written warning:

      *In response to the final warning, I received on 29 November 2021 for allegedly
      violating the social media policy. I adamantly disagree with the final written
      disciplinary action. I disagree that my post on LinkedIn violates any social media
      policy and therefore there should be no reason for any type of disciplinary action
      against me. I have not seen the evidence that Carly Pasquini says exists nor have I
      gotten a chance to discuss this issue other than a conversation that involved Marsha
      Myers and Carly Pasquini over the phone on my way home from work where I was
      unable to hear a large portion of the conversation due to driving. I welcomed the
      call because I thought I was going to have an opportunity to have my point of view
      heard. In this write up it talks about the code of conduct but strangely, the SRVP of
      our HR, Carly Pasquini, is only concerned about the parts that build her case and
      not about the human being that feels strongly about vaccine mandates. My post was
      not about HCA or Grand Strand Medical Center. My post was about big
      government pushing healthcare measures on the citizens of this free country with
      those measures not backed up by science. For anyone to take offense to my opinion
      is just ludicrous. If we were only able to have a conversation about my feelings
      instead of trying to make them fit Carly's and Marsha's narrative that my post was
      unprofessional and violated a policy. In no way, shape or form was my post
      **defamatory, obscene, proprietary or libelous** to anyone which is the exact verbiage
      in this disciplinary action. Attached to this response is the post, it has been edited
      from the original post, but only to add my personal view of distaste for the current
      president and Fauci.*
      *I am a proud Veteran of the US Army and I feel like I am being discriminated
      against because of my strongly rooted sense of duty and commitment to this
      country. Before I ever donned the uniform, I raised my right hand and swore an
      oath to protect and defend the Constitution of the United States of America against
      all enemies, both foreign and domestic, so help me God. Even though I am no
      longer in the military, that oath did not leave me when I walked away from my
      service to this country. I served for almost 8 years and deployed to Iraq in support*

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

of Operation Iraqi Freedom. When I joined the civilian workforce, I never thought holding an opinion on a social platform would cause so many people grief. I still to this moment have not heard of anyone taking offense by my post. Code of Conduct. A large portion of this year's code of conduct is about diversity and inclusion. Diversity is about whom our workforce represents. This includes dimensions like race, gender, age and veteran status along with other characteristics of LIFE and WORK experience. Inclusion is how we feel at work. We should receive equitable treatment and we should feel welcome in the work environment and with the team. Diversity and inclusion create a healthy ecosystem where all colleagues can thrive. This disciplinary action reveals Carly's unconscious bias against Veterans. Not one person who I have spoken to can understand the deeply rooted sense of duty that taking the oath of enlistment gifts a soldier. I see stereotype bias here as well. I am being treated poorly without regard to my personal lived experiences. I also see first impression bias. This is evident in the thirty-six hours of stalking my LinkedIn profile by Carly Pasquini, Marsha Myers, an unknown "administrative" person with grand strand hospital and Shelly Picthall. Every couple of hours one or more of those mentioned looked me up and stalked my profile. I was judged by what was seen first. Those that stalked my profile, which created a hostile work environment, created their own narrative by adding context and tone explicitly unintended by the author. I had to initiate the conversation after seeing my profile stalked for a day and a half. The first impression bias leads to Carly's and Marsha's confirmation bias where they looked for proof to back up their beliefs while discounting what I was saying. My point of view was not considered, nor was it fully discussed. The information considered does not support this disciplinary action.

Now I feel like my senior vice president of human resources has a "Horns" bias against me because of this issue and it will affect all future interaction between me and our HR partners. This disciplinary action also shows a lack of cultural competence coming from our senior leaders, like Carly and Marsha. Becoming aware and respectful of the differing views and norms of people like me, a combat Veteran and over the age of forty is a group that few are taking the time to understand. I am quite surprised at the lack of mindfulness of the Veteran's experience that I see in our hospital, especially with the representatives we have in our human resources department. In my mind, GSMC represents the entire HCA enterprise. When did human resources become less about the human?

The HCA culture of caring starts with taking care of our own. We speak the mission statement "Above all else, we are committed to the care and improvement of human life" which includes those that bear the brunt of today's stressful healthcare industry. This disciplinary action is the antithesis of that goal. The culture of caring is a reflection of our organization where our culture is only as good as we make it and maintain it. Care like family means to listen and support colleagues throughout their personal concerns and struggles. My post was my expression and core belief as a US Army Veteran. My beliefs are covered under diversity and inclusion and all the other caring themes we take seriously in our organization. HCA claims to have award-winning models of diversity, inclusion and equity, but this action against me seems to be far from those models. My post should be held up to the

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

*same standards of inclusivity of expression like Black Lives Matter or the expression of gender pronouns. That standard should apply to everyone in the HCA enterprise.*

66.    While in Gurano's office, Gurano informed the Plaintiff that an employee took offense to the conversation that the Plaintiff had with Keith Wehrung in the emergency department administration office.   On November 29, 2021 the Plaintiff had a conversation with Wehrung regarding the Plaintiff's son had recently informed him that he was now 'trans' and wanted to change his name.  The Plaintiff informed Gurano that he wish he knew was offended because if they were going through something similar they needed to be talking together about it instead of being offended.   Gurano informed the Plaintiff that he was perceived as aggressive.   The Plaintiff again felt that he was being treated differently because of his sex, his complaints regarding race and the vaccine.

67.    On December 1, 2021, the Emergency department realized that there was a staffing cut.

68.    On December 1, 2021, the Plaintiff received a call from Houston/Southeast informing him that the Medical Directors of the two facilities wanted to have an interview with him.

69.    On December 3, 2021, during a division call for the leadership of the freestanding emergency departments the Plaintiff asked questions regarding a new program they are piloting. The presenter and others took offense and told me they would get with me offline about it. The Plaintiff subsequently apologized to them both after the call because they felt disrespected, not because the Plaintiff felt like he disrespected them. The Plaintiff received texts from Gurano about the call, the Plaintiff and Gurano spoke about it, and she said she would not do anything unless "they" made her.

70.    On December 6, 2021, the Plaintiff was terminated.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

71.     On December 7, 2021, the Plaintiff sent an email to Jill Smith (HR Representative), Marsha Myers (COO), and Amy Gurano (Director Emergency Services) requesting that his termination be brought before a peer review panel in accordance with HCA policy. According to HCA policy, the panel was required to be assembled by January 6, 2022, and issue a decision.

72.     The Defendants failed and refused to commence the peer review panel in accordance with their grievance procedure.

73.     The Plaintiff had no contact with the Defendant to issue any threats.  However, on December 9, 2021, the Defendants issued a "Be on the Lookout" security notice for the Plaintiff stating that the following "Subject has had employment terminated.  Unspecific threats have been made toward facility leadership."  Despite stating that the BOLO was confidential and should not be shared outside of the security team the BOLO was known to all persons in the hospital.

74.     That other younger females were permitted to conduct themselves unprofessional, aggressively, and overly belligerently with no ramifications.  Many of them were disciplined but not terminated.  The Plaintiff was subjected to harsher penalties because of his sex, opinions, complaints regarding differential treatment and race, disability, and age.

75.     Another female, ER manager was allowed to be demoted rather than be terminated for committing the same or more egregious acts than the Plaintiff.

76.     That Defendants wrongfully discriminated against the Plaintiff in violation of Title VII and 42 U.S.C. 1981 by treating him differently and terminating him for reporting race discrimination.  The Plaintiff reported differential treatment of employees to Ethics and Compliance and was terminated.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

77.  That the Plaintiff attempted to grieve his termination.

78.  That each of the reasons presented by the Defendant's reasons for treating the Plaintiff differently were pretextual.

79.  The reasons presented by the Defendant for discipling the Plaintiff and terminating his employment were pretextual.

80.  Defendant's actions described herein were intentional and inflicted upon Plaintiff severe mental and emotional distress.

81.  As a result of Defendant, Grand Strand's actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, loss of promotion, loss of benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity, and other intangible injuries for all of which he should be compensated.

82.  That the Defendant, Grand Strand, is the direct and proximate cause of injury to the Plaintiff.

83.  That the Plaintiff was issued certain policies and procedures by the Defendant.

84.  The Defendants violated the policies and procedures by failing to follow the actual policies in place against discrimination, hostile work environment and retaliation.

85.  That as a result of Defendant, Grand Strand's actions violated the Plaintiff's Civil Rights. The Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

86.  That the Defendants' actions towards the Plaintiff violated the law both State and Federal.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

87.    That the Defendants are the direct and proximate cause of damage to the Plaintiff.

88.    That, as a direct and proximate result of the Defendants intentional unlawful actions towards the Plaintiff based on the Plaintiff's South Carolina and Federal Law the Plaintiff:

    a.    suffered severe emotional distress;

    b.    suffered future lost wages and future lost benefits;

    c.    suffered economic damages;

    d.    Loss of employment;

    e.    Loss of Future employment;

    f.    incurred attorney fees for this action;

    g.    incurred costs of this action; and

    h.    will incur future attorney fees and costs.

89.    That the Plaintiff is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees previous, future and present, costs of previous future and this action, and other damages such as this Honorable Court deems appropriate and just.

90.    Pursuant to 42 U.S.C. Section 1981A, Plaintiff also seeks compensatory damages including future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

91.    Pursuant to 42 U.S.C. Section 1981A, Plaintiff also seeks to recover punitive damages from Defendant for discriminating/Retaliating against Plaintiff with malice or with reckless indifference to Plaintiff's federal protected rights.

92.    Plaintiff seeks all back pay and fringe benefits to which she is entitled under 29 U.S.C. Section 626(b), as well future damages and liquidated damages under the act.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

93.   As Plaintiff is seeking damages under 42 U.S.C. 1981A and 29 U.S.C. Section 626(b) Plaintiff also demands a jury trial as to all claims properly tried to a jury pursuant to 42 U.S.C. Section 1981(A)(c)(1) and pursuant to 29 U.S.C. Section 626 (c)(2).

94.   Pursuant to 42 U.S.C. Section 1988(c) and 42 U.S.C. Section 2000e-5(k), Plaintiff seeks his attorney's fees in bringing this action, including expert witness fees, and further seeks his costs associated with bringing this action pursuant to 28 U.S.C. 1920 of the Federal Rules of Civil Procedure, along with prejudgment and post-judgment interest pursuant to the law.

## FOR A FIRST CAUSE OF ACTION

## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

95.   That Paragraphs one (1) through ninety-four (94) are hereby incorporated verbatim.

96.   That during the Plaintiff's employment he witnessed female nurses receive more favorable treatment than he did as a male.

97.   The Plaintiff witnessed female nurses receive more favorable job assignments, less discipline, and better raises than their male counterparts.

98.   The Plaintiff witnessed his female counterparts commit the same offenses or worse and were not discipline, disciplined lightly, or were allowed to be demoted rather than terminated from their employment.

99.   That the Plaintiff complained about the Diversity and Inclusion Committee as being exclusionary and not have one white male.

100.  That the Plaintiff participated in a protected act when he reported discrimination based on sex.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

101. That the Defendant allowed the Plaintiff to be discriminated against based on sex in violation of their own policies and procedures.

102. That the Plaintiff reported the discrimination. That the Defendant failed and refused to correct the behavior. That the behavior became worse after the Plaintiff's reports.

103. That the Defendant allowed the Plaintiff's supervisor to treat individuals not in the Plaintiff's protected class more favorably without repercussions.

104. That the Defendants discriminated against the plaintiff based on his sex by allowing females to be treated more favorably.

105. That the Defendants took adverse employment action against the Plaintiff by:

    (a)    Failing to protect the Plaintiff from a Hostile work environment;

    (b)    Failing to return the Plaintiff to work;

    (c)    Disciplining the Plaintiff for pretextual reasons; and

    (b)    Refusing to enforce its own policies concerning discipline of employees engaging in harassing comments.

102. That the Defendants subjected the Plaintiff to discrimination in violation of the law.

103. That, as a direct and proximate result of the Defendants' intentional, unlawful and retaliatory actions, the Plaintiff:

(a)    Suffered severe emotional distress;

(b)    Suffered lost wages and benefits;

(c)    Suffered future lost wages and benefits;

(d)    Incurred attorney's fees and costs of this action.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

105.    That the Plaintiff is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees, costs of this action, and other damages such as this Honorable Court deems appropriate and just.

**FOR A SECOND CAUSE OF ACTION**

**AGE DISCRIMINATION IN VIOLATION OF THE**

**AGE DISCRIMINATION IN EMPLOYMENT ACT**

106.    That paragraphs one (1) through one hundred and five(105) are hereby incorporated verbatim.

107.    That the Plaintiff at all times during the alleged discrimination was a male over the age of 40.

108.    That at all times relevant to this cause of action the Defendants were employers as defined by the Age Discrmination in Employment Act having more than 20 employees.

109.    That the Plaintiff was subjected Age Discrimination while employed with the Defendants.

110.    That the Defendants, treated the Plaintiff significantly differently based on his age.  That younger individuals were not discipline and terminated for much worse actions allegedly committed by the Plaintiff.

111.    That the Defendant, treated the Plaintiff significantly different than it treated younger employees.  That the Defendant did not discipline younger employees for actions that would have been terminable offesnses.

112.    That the Defendant's actions towards the Plaintiff violated the law.

113.    That the Defendant is the direct and proximate cause of damage to the Plaintiff.

114.    That, as a direct and proximate result of the Defendant's intentional unlawful actions towards the Plaintiff based on the Plaintiff's age, the Plaintiff:

34

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

a.    suffered severe emotional distress;

b.    suffered future lost wages and future lost benefits;

c.    suffered economic damages;

d.    Loss of employment;

e.    Loss of Future employment;

f.    incurred attorney fees for this action;

g.    incurred costs of this action; and

h.    will incur future attorney fees and costs.

115. That the Plaintiff is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees previous, future and present, costs of previous future and this action, and other damages such as this Honorable Court deems appropriate and just.

## FOR A THIRD CAUSE OF ACTION

## RETALIATION FOR COMPLAINTS REGARDING RACE DISCRIMINATION,  SEX DISCRIMINATION, AGE DISCRIMINATION, AND HOSTILE WORK ENVIRONMENT COMPLAINTS

116. That Paragraphs one (1) through one hundred and fifteen (115) are hereby incorporated verbatim.

117. That the Plaintiff was an employee according to the law of the State of South Carolina, Federal Law including but not limited to Title VII, 42 U.S.C. 1981, ADA, and ADEA.

118. That the Plaintiff has filed made complaints regarding Sex, Race, Age and disability discrimination to management.   As a result of those complaints the Plaintiff was disciplined and terminated from his employment.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

119. The Plaintiff complained that the Diversity and Inclusion Committee did not include all employees. That the white male was specifically excluded from the Committee and this violated the mission statement of the hospital, the committee and the Defendants. The Plaintiff further complained that male nurses were under represented in management. The Plaintiff further complained that he was being treated differently based on his race, sex, disability and age to the Ethics and Compliance department. Ethics and Compliance attempted to assist him. However, they were shut down at every turn.

120. As a result of those complaints the plaintiff has been treated differently and subjected to retaliation.

121. That the Defendants retaliated against the Plaintiff by disciplining him and terminating his employment. The Defendants intentionally disciplined the Plaintiff in order to prevent him from seeking employment elsewhere within the hospital system and terminated him intentionally so that he would not be eligible for the promotion in Houston.

122. That as a result of the Plaintiff's complaints the Plaintiff suffered retaliation for each of his complaints.

123. That the Plaintiff was considered an exemplary employee by many of his supervisors until his complaints regarding differential treatment, vaccine mandates by the government and discrimination.

124. As a result of the Plaintiff's complaints regarding discrimination based on his Race, Sex, Disability, Age, and hostile work environment based on his previous complaints the Defendant retaliated against the Plaintiff.

125. The Defendants' actions described herein were intentional and inflicted upon Plaintiff to insure severe mental and emotional distress.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

126. As a result of Defendants' actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

127. That the Defendants are the direct and proximate cause of injury to the Plaintiff.

128. That the Plaintiff is entitled to an award of damages from the Defendants.  That the Plaintiff is entitled to recover damages from the Defendants in the amount of actual damages, consequential damages, punitive damages, reasonable attorney's fees, the costs of this action and all other damages available pursuant to Title VII, ADA, 42 U.S.C. 1981 and ADEA.

## FOR A FOURTH CAUSE OF ACTION

## HOSTILE WORK ENVIRONMENT

129. That Paragraphs one (1) through one hundred and twenty-eight (128) are hereby incorporated verbatim.

130. That the Plaintiff was an employee of the Defendants.

131. That the Defendants are employers in accordance with Title VII, 42 U.S.C. 1981 ADA and ADEA.

132. That the Defendants subjected the Plaintiff to a hostile work environment for his complaints and his opposition to discrimination, favorable treatment of others and complaints regarding the hospital failing and refusing to follow policy.

133. That the Plaintiff's work environment was abusive, to the point of severe and pervasive.

134. The Plaintiff was subjected to discrimination based on his Race, Sex, Disability and Age.

135. That the Defendant failed and refused to address the situation.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

136. That the Plaintiff suffered severe emotional distress as a result of the Defendant's hostile work environment based on the Plaintiff's Sex, Race, Age and Disability.

137. That the Plaintiff's severe emotional distress was foreseeable as a result of the severe and pervasive work environment that the Defendant subjected the Plaintiff.

138. That the Plaintiff has been damaged as a result of the Defendant work environment.

139. That the Defendant is the direct and proximate cause of damage to the Plaintiff.

## FOR A FIFTH CAUSE OF ACTION

## WRONGFUL TERMINATION

140. Paragraphs one (1) through one hundred and thirty-nine (139) are hereby incorporated verbatim.

141. That the Defendant, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon, terminated the Plaintiff for his opposition to the vaccine mandates issued by the federal government.

142. That the Plaintiff voiced his opinion regarding the vaccine mandates through a post on social media. After making the post the Plaintiff was terminated.

143. The Plaintiff's post had no affiliation with the Hospital.

144. That the Plaintiff's termination violation South Carolina Code and Public Policy.

145. That the Defendants are the proximate and direct cause of damages to the Plaintiff.

146. That the Plaintiff is entitled to an award of damages from the Defendant for their negligent supervision of their employees in the amount of actual, compensatory, and punitive damages.

## FOR A SIXTH CAUSE OF ACTION

## RACE DISCRIMINATION IN

## VIOLATION OF TITLE VII and 42 U.S.C. 1981

147. That Paragraphs one (1) through one hundred and forty-six (146) are hereby incorporated verbatim.

148. That the Plaintiff has been treated differently based on his race by the Defendants.

149. That the Plaintiff was slandered, ostracized, degraded, bullied, harassed, and intimidated based on his complaints regarding discriminatory practices of the hospital.

150. That the Defendant allowed the Plaintiff to be discriminated/Retaliated against based on his race in violation of their own policies and procedures.

151. That the Plaintiff reported the differential treatment of employees, failure to include all employees, the discrimination against white male nurses, and the under representation of white male nurses. The Plaintiff further reported these issues to Ethics and Compliance. As a result of that conversation the Plaintiff was retaliated against with discipline and termination.

152. That the Defendants discriminated against the plaintiff based on his race.

153. That, as a direct and proximate result of the Defendants intentional, unlawful and retaliatory actions, the Plaintiff:

      (a)     Suffered severe emotional distress;

      (b)     Suffered lost wages and benefits;

      (c)     Suffered future lost wages and benefits;

      (d)     Incurred attorney's fees and costs of this action.

154. That the Plaintiff is entitled to an award of damages in the amount of actual damages, compensatory damages, consequential damages, punitive damages, attorney's fees, costs of this action, and other damages such as this Honorable Court deems appropriate and just.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

## FOR A SEVENTH CAUSE OF ACTION

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF ADEA, ADA, TITLE VII, AND

## 42 U.S.C. 1981

155. That Paragraphs one (1) through one hundred and fifty-four(154) are hereby incorporated verbatim.

156. That the Plaintiff was an employee of the Defendants.

157. That the Defendants, Grand Strand Medical Center/HCA Healthcare, Inc./Parallon was an employer in accordance with 42 U.S.C. Section 1981, ADEA, ADA, and Title VII.

158. That the Defendant subjected the Plaintiff to a hostile work environment.

159. That the Plaintiff's work environment was abusive, to the point of severe and pervasive.

160. The Plaintiff was subjected to discrimination based on his Race (white), sex (male), Disability (hearing) and Age (over the age of 40) and in retaliation for his complaints regarding differential treatment the protected categories as listed.

161. That the Defendants perpetrated the hostile work environment.

162. That the Plaintiff suffered severe emotional distress as a result of the Defendant's hostile work environment based on the treatment received by management, employees and others due to his complaints.

163. That the Plaintiff's severe emotional distress was foreseeable as a result of the severe and pervasive work environment that the Defendant subjected the Plaintiff.

164. That the Plaintiff has been damaged as a result of the Defendant work environment.

165. That the Defendants are the direct and proximate cause of damage to the Plaintiff.

166. That the Plaintiff is entitled to any and all damages permitted under federal law.

## FOR AN EIGHTH CAUSE OF ACTION

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

## **DISABILITY DISCRMINATION**

167. That Paragraphs one (1) through one hundred and sixty-six(166) are hereby incorporated verbatim.

168. The Defendants are employers as defined in ADA.

169. That the Plaintiff is an employee as defined by the ADA.

170. That the Plaintiff was considered an exemplary employee.

171. That while he has been employed with the Defendants, the Plaintiff has been able and has performed his job duties in a satisfactorily level of the Defendant.

172. That the Defendants considered the Plaintiff's disability or perceived disability when considering any and all employment decisions and termination.

173. That the Plaintiff was treated significantly differently than other employees who did not suffer from a disability.

174. The Plaintiff was disciplined and terminated for actions that were either similar or much worse than other employees who were not disciplined or terminated for.

175. That the Plaintiff reported differential treatment and was subjected to a hostile work environment as a result.

176. That the Plaintiff notified the Defendant on several occasions of his disability. The Defendant was well aware of it and had even discussed it with the Plaintiff throughout his employment.

177. That the Defendants discriminated against the Plaintiff based on his disability, record of disability or perceived disability.

178. That the Defendants is the proximate and direct cause of damage to the Plaintiff.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

179. That the Plaintiff has suffered severe emotional damages as a result of the Defendants' discrimination against the Plaintiff.

180. That the Plaintiff was denied the position based on consideration of his disability, the Defendants' perception of the Plaintiff's disability, or in consideration of the Plaintiff's disability, the Defendants violated the ADA.

181. That as a direct result of the Defendants' violation of ADA the Plaintiff has suffered:

       i. Considerable damage to his reputation;

      ii. Economic damages;

     iii. Economic hardship;

     iv. Loss of his position;

      v. Actual and future lost wages;

     vi. Loss of beneifits;

    vii. Loss of future Benefits;

   viii. Suffered anxiety, humiliation and emotional damages.

182. That the Plaintiff is entitled to recover damages from the Defendants in the amount of actual damages, consequential damages, punitive damages, reasonable attorney's fees, the costs of this action and all other damages available pursuant to the ADA for the Defendant's discrimination against the Plaintiff based on his disability.

## **PRAYER FOR RELIEF**

WHEREFORE plaintiff prays that this Honorable Court:

A. Accept jurisdiction over this matter, including the pendent claim;

B. Empanel a jury to hear and decide all questions of fact;

C. Award the Plaintiff lost wages, future lost wages, lost benefits and future lost benefits;

D. Award to plaintiff compensatory and consequential damages against the defendant;

E. Award to plaintiff punitive damages against the defendants for their malicious and spiteful pattern of race discrimination/Retaliation;

F. Award to the Plaintiff all damages available to the Plaintiff pursuant to the State of South Carolina;

G. Award to plaintiff All damages available to the plaintiff damages against the defendant for their malicious discrimination/Retaliation against the plaintiff in violation of Title VII and 42 U.S.C. 1981;

H. Award to plaintiff All damages available to the plaintiff damages against the defendant for their malicious discrimination/Retaliation against the plaintiff in violation of Title VII for sex discrimination;

I. Award to the Plaintiff all damages available pursuant to the ADEA;

J. Award to the Plaintiff all damages available purusan to the ADA;

K. Award to the Plaintiff all damages available pursuant to the constitution of the United States and the State of South Carolina;

L. Award to plaintiff the reasonable attorneys' fees and costs incurred in the prosecution of this matter;

M. Award all damages available to the Plaintiff pursuant to Federal Law;

N. Permanently enjoin the defendants, their assigns, successors, agents, employees and those acting in concert with them from engaging in discrimination, disparate treatment or retaliation against plaintiff and

O. enter any other order the interests of justice and equity require.

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

ELECTRONICALLY FILED - 2023 Mar 02 2:09 PM - HORRY - COMMON PLEAS - CASE#2023CP2601318

HUNT LAW LLC

*s/Bonnie Travaglio Hunt*
Bonnie Travaglio Hunt
HUNT LAW LLC
4000 Faber Place Drive, Suite 300
North Charleston SC 29405
Post Office Box 1845, Goose Creek, SC 29445
(843)553-8709

Dated:  March 2, 2023